# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

|  |  |
|---|---|
| BRYAN D. WINTER, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. |  |
| EDWARD D. JONES & CO., L.P. THE JONES FINANCIAL COMPANIES, L.L.L.P., and EDJ Holding Company, Inc. | **JURY TRIAL DEMANDED** |
| Defendants. |  |

Plaintiff Bryan Winter, on behalf of himself and all others similarly situated, for his complaint against Defendants Edward D. Jones & Co., L.P., The Jones Financial Companies, L.L.L.P., and EDJ Holding Company, Inc. (collectively "Edward Jones"), alleges as follows.

## NATURE OF ACTION

1. This is a case of explicit, intentional, employment discrimination. Edward Jones has a stated, nationwide policy that expressly favors "diverse" financial advisors to the disadvantage of white financial advisors concerning the compensation, terms, conditions, and/or privileges of their employment because of the advisors' race. Edward Jones proudly proclaims that it focuses on "equity," *not equality*. And because Edward Jones does not treat the races equal, Edward Jones violates the law. Plaintiff Winter brings this action on behalf of himself, and all other similarly situated current and former Edward Jones advisors, for injunctive relief to stop this unlawful practice, and for damages.

1

**PARTIES**

2.  Plaintiff Bryan Winter is a natural person who, at all times relevant to this action, was and is a citizen and resident of Suffolk, Virginia.

3.  Defendant Edward D. Jones & Co. L.P. ("EDJ") is, on information and belief, a limited partnership organized under Missouri law, with its principal place of business in St. Louis County, Missouri.

4.  Defendant The Jones Financial Companies, L.L.L.P. ("JFC") is, on information and belief, a registered limited liability limited partnership, organized under Missouri law, with its principal place of business in St. Louis County, Missouri. On information and belief, JFC is the limited partner of EDJ, owns 99% of the interest in EDJ, and actively manages EDJ in conjunction with Defendant EDJ Holding Company, Inc.

5.  Defendant EDJ Holding Company, Inc. ("EJ Holding") is, on information and belief, a corporation organized and incorporated under Missouri law, with its principal place of business in St. Louis County, Missouri. On information and belief, EJ Holding is the general partner of EDJ, and owns 1% of the interest in EDJ.

**JURISDICTION AND VENUE**

6.  This Court has subject matter jurisdiction over the federal claims asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1343.

7.  The court has personal jurisdiction over each of the Defendants because each is headquartered in Missouri.

8.  Venue in this district is appropriate under 28 U.S.C. § 1391(b)(2) because each of the Defendants is headquartered in this district.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

9. Edward Jones is in the business of, among other things, investment advisory services.

10. To serve its clients, Edward Jones owns, operates, and controls more than 15,000 offices throughout the United States.

11. Edward Jones staffs its offices with financial advisors, whom Edward Jones recognizes as its employees, to serve Edward Jones clients. At all times relevant here, Edward Jones has employed, on information and belief, substantially more than 10,000 financial advisors. Upon information and belief, Edward Jones currently employs more than 19,000 financial advisors.

12. The Edward Jones "Home Office" (comprised of policy makers at EDJ, JFC, and EJ Holdings) controls all aspects of how the financial advisors and other personnel in Edward Jones offices are hired, compensated, promoted, fired, and perform their work. The Home Office monitors day-to-day operations, and implements various policies and practices.

13. And when it comes to the compensation, terms, conditions, and privileges of the financial advisors, Edward Jones actively and explicitly discriminates against whites in favor of other races.

14. Edward Jones is clear. In their promotional materials, in their events and conferences, and in face-to-face meetings focused on personnel matters, Edward Jones makes no bones about it: Edward Jones focuses on *equity, not equality*. This policy permeates all aspects of an Edward Jones financial advisor's employment.

*Edward Jones's Discriminatory Policy Manifests in the*
*Goodknight Incentive Compensation Structure*

15.     As the following diagram shows unambiguously, it was and is the documented, stated policy—indeed the firm "strategy"—at Edward Jones to discriminate based on race:



The "Women and/or Diverse" box circled in the diagram refers to advisors who are women, who identify as part of a minority race or ethnicity, and/or who identify as gay, lesbian, bisexual, trans, or other minority gender / sexual orientation. In other words, anyone who is not a straight, white, male ("SWM").

16.     This particular diagram illustrates just one—but a significant—way in which Edward Jones unambiguously discriminates based on race. It concerns compensation from so-called "Goodknights." A Goodknight is akin to transferring wages, job performance ratings, and job growth opportunity.

17.     One way in which Edward Jones compensates its financial advisors is by paying them a percentage of the fees / commissions generated from the assets in the financial advisors' books of business. Under a Goodknight, Edward Jones transfers the assets of one or more of its

4

clients from the book of one of its financial advisor employees to the book of another financial advisor employee. When Edward Jones transfers the assets, Edward Jones begins paying the receiving advisor fees / commissions on those assets. But Edward Jones also compensates the transferor financial advisor, as an incentive to agree to the transfer. And, as illustrated above, Edward Jones pays the transferor advisor more—"Additional Compensation"—for the exact same transfer if the assets are transferred to "women and/or diverse" advisors than if they are transferred to a SWM advisor.

18.     These transfers also affect the financial advisors' "performance" ratings. Edward Jones grades each of its financial advisors—assigning each a numerical value—based on the assets he / she brings into the firm and the commissions generated by his / her book of business. Fees / commissions on assets received as part of a Goodknight count toward, and therefore increase, a financial advisor's numerical performance rating.

19.     Discriminating against SWMs in favor of "women and/or diverse" advisors affects the compensation, terms, conditions, and privileges of the financial advisors' employment, as well as the enjoyment of the benefits, privilege, terms and conditions of their employment relationship with Edward Jones that is not the same as the relationship "women and/or diverse" advisors enjoy. When Advisor A receives a Goodknight that Advisor B does not, Advisor A is automatically earning fees / commissions on the assets for which Advisor B cannot; Advisor A's performance rating is increased relative to Advisor B's, Advisor A has additional clients to service which are unavailable to Advisor B; Advisor A has a broader base from which to grow his/her book, as well as the services and products he/she can offer to the particular client(s) that Advisor B cannot, and each of these advantages Advisor A for future advancement and compensation relative to Advisor B.

5

20. Worse, this policy favors certain advisors based *solely* on their membership in certain race, ethnicity, and/or sex-based classifications. The "additional compensation" incentive in Block D of the diagram above (¶ 15) turns *only on* whether the receiving financial advisor is a minority, with no regard to any other factor such as, for example, the receiving advisor's performance or any other merit-based metric.

### *Edward Jones's Discriminatory Policy Manifests in Edward Jones's Hiring, Firing, and Promotion Practices*

21. But the Goodknight compensation structure is not the only way in which Edward Jones's nakedly discriminatory policy / "firm strategy" manifests and causes harm based on race. Edward Jones favors non-white financial advisors for advancement over white advisors, particularly when it comes to assigning financial advisors to offices, and for promotion to limited partner and general partner.

22. As noted above (¶ 10), Edward Jones has thousands of offices across the United States. And many of those offices are staffed with only one or a small handful of financial advisors.

23. As financial advisors retire or otherwise leave the company, they leave these Edward Jones offices and the Edward Jones clients associated with those offices without an advisor. But Edward Jones does not consider replacements for these often lucrative positions based strictly on merit. Rather, Edwards Jones's nationwide "equity not equality" discriminatory policy manifests here too: Edward Jones favors non-white candidates over whites, who are disadvantaged for these opportunities, and for advancement to the upper echelons of Edward Jones's leadership ranks. Here again, it is the race of the applicant—not merit—that is a but-for and motivating factor for which employee is placed into the office and which are excluded, as time and again, poor performing non-white financial advisors are put into these positions over whites with better performance.

24. Similarly, non-white financial advisors are favored over whites when it comes to termination. When white financial advisors' performance ratings reach below a particular threshold (i.e. a score of 30 out of 150), they are given a matter of months to raise their performance scores. If they do not, it is Edward Jones's usual practice to terminate them. But when non-white financial advisors repeatedly fail to bring their performance scores up within the same time period, they are rarely terminated.

25. There is no mystery why non-white financial advisors are favored for advancement and termination even when merit / performance does not justify such actions. Edward Jones admits that it has "Accountability Scorecards" to hold leadership accountable to Edward Jones's "equity not equality" policy of discriminating against whites. These scorecards grade middle managers on how many "diverse" financial advisors they retain and promote. Edward Jones admits that these scorecards are then shared with Edward Jones's Enterprise Leadership Team and general partners. These scorecards are a major factor when grading regional leadership, and can result in extremely large bonuses based on these scorecards. This creates obvious incentives and pressures from the top down to ensure that white advisors are discriminated against in favor of non-white advisors.

**PLAINTIFF BRYAN D. WINTER**

26. Plaintiff Winter is a SWM.

27. Plaintiff Winter grew up in a financially disadvantaged household, subsisting on government assistance for most of his childhood.

28. After serving his country as a nuclear submarine officer in the United States Navy, Edward Jones hired Plaintiff Winter as a financial advisor employee in Virginia.

29. When he started, Plaintiff Winter did not have personal wealth, clients, or client leads. But he had grit, and he worked hard.

7

30. From his humble roots, Plaintiff Winter's performance rating was 150 (the maximum possible score) for nearly his entire 3-year career at Edward Jones.

31. He regularly qualified for bonuses and trips that were based on objective, quantifiable metrics.

32. Plaintiff Winter was recognized numerous times by both Edward Jones's regional leadership and the Home Office as a top performer, and he was hand-picked by both regional leadership and the Home Office to mentor other financial advisors through multiple Edward Jones programs. For example, he was picked to conduct regular calls with new and junior level financial advisors (up to Level 2) to coach them on how to better serve their clients, increase efficiency, and bring in more assets. Edward Jones also hosted a podcast featuring Plaintiff Winter on how to bring in assets; a podcast Plaintiff Winter understands that is still provided to and listened to by Edward Jones financial advisors to this day.

33. But despite the objective markers of his success, he eventually left Edward Jones because the "equity not equality" nationwide discriminatory policy against him and other SWMs created a toxic work environment.

34. The Goodknight compensation structure disadvantaged him and other SWMs: he would have received more Goodknights (and certainly would have had had a better chance to receive such Goodknights), and both the short term and long term benefits that came with those Goodknights, were it not for the policy.

35. It was also clear that a SWM just did not have a fair opportunity for advancement at Edward Jones because of Edward Jones's policy. His opportunity for advancement and lucrative vacant office positions were diminished because of his race.

36. For example, Plaintiff Winter is aware of a discussion between two regional leaders concerning a vacant office. The leader from outside the region suggested a black, female advisor from outside the region for the vacant position because he needed a "black skirt" to meet diversity goals. And while the other leader was unhappy with the suggestion because others in his region were more deserving of the role, he ultimately agreed to the "black skirt" because of Edward Jones's corporate policies.

37. As another example, Plaintiff Winter was asked to help another black female financial advisor who had been with the firm approximately five years. Her performance was below the 30% performance threshold for extended periods of time—a performance rating that would have normally resulted in termination if the advisor was a SWM. Despite her poor performance, she would regularly "ghost" Plaintiff Winter when they were scheduled for coaching sessions. Plaintiff Winter's superiors asked why her numbers were so low and Plaintiff Winter explained that she was not doing her work, she was ignoring advice, and standing him up for their scheduled calls. But Plaintiff Winter's superior told him that she was "untouchable" based on decisions by leadership above him. And, when a successful financial advisor left, she was selected to inherit the office. She was then praised on multiple monthly regional calls for her increased numbers—numbers derived from the already-established office, not her own efforts to bring in new assets.

38. Plaintiff Winter talked to many other Edward Jones partners about this situation and they told him you have to "play the game."

39. Indeed some in senior leadership have privately acknowledged that these are bad policies, but Edward Jones continues to perpetuate them.

9

40. Plaintiff Winter lost all hope that he even had a fair chance to advance to the upper echelons of Edward Jones and make general partner—as his hard work and performance would deserve—because of Edward Jones's discriminatory policy.

41. The toxic work environment caused substantial emotional and psychological injuries such that he had no choice but to leave his position at Edward Jones, lose hundreds of existing clients / assets and approximately 1,000 prospects he had in the Edward Jones system, and start all over from scratch somewhere else.

## CLASS ACTION ALLEGATIONS

42. Plaintiff repeats and realleges each and every allegation set forth above as if they were set forth here.

43. Plaintiff brings this action individually and on behalf of others similarly situated pursuant to Rule 23(a),  Rule 23 (b)(1), Rule 23(b)(2), Rule 23(b)(3), Rule 23(c)(4) and/or Rule 23(c)(5).

44. Plaintiff proposes the following Class definition, subject to modification:

> All white individuals who worked for Edward Jones as a financial advisor at any time from the date four years prior to the filing of this Complaint.

45. The proposed Class meets Rule 23(a)'s numerosity requirement because thousands of individuals are members in the class so that they are so numerous that joinder of all members is impracticable.

46. The proposed Class meets Rule 23(a)'s commonality requirement because there are questions of law or fact common to the class, including but not limited to:

10

    a.    Whether Edward Jones has an express policy / "firm strategy" of discriminating against white financial advisors and in favor of non-white financial advisors;

    b.    Whether Edward Jones's Goodknight policy unlawfully discriminates against white financial advisors;

    c.    Whether Edward Jones's express "equity, not equality" policy unlawfully discriminates against white financial advisors;

    d.    Whether Edward Jones's DEI initiatives unlawfully discriminate against white financial advisors;

    e.    Whether Edward Jones's race-based policies have harmed members of the Class;

    f.    Whether the Class is entitled to damages; and

    g.    Whether Edward Jones should be enjoined from continuing their race-based employment policies.

47. Plaintiff meets Rule 23(a)'s typicality requirement with respect to the Class because Plaintiff was a white male who worked as a financial advisor at Edward Jones during the relevant time period and was subject to the same discriminatory policies as others in the Class, and he has the same claims as other members of the Class.

48. Plaintiff meets Rule 23(a)'s adequacy requirement as Plaintiff has hired counsel with extensive experience in complex litigation, including employment and class action experience.

49. This action meets Rule 23(b)(1)'s requirements because separate actions addressing whether Edward Jones's nationwide race-based policies are unlawful creates substantial risk that:

      a.      Different actions could reach inconsistent or varying adjudications as to the legality of the same nationwide Edward Jones policies; and/or

      b.      As a practical matter, the adjudication of Plaintiffs' case would be dispositive of the interests of the other members of the Class not parties to this proceeding, or would substantially impair or impede their ability to protect their interests.

50.    This action meets Rule 23(b)(2)'s requirements because Edward Jones's creation and uniform enforcement of its race-based policies constitutes acts on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

51.    This action meets Rule 23(b)(3)'s requirements because the questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy in part because:

      a.      This action challenges an express, nationwide Edward Jones policy that applies uniformly, such that any individual issues would be minimal, and there should be consistency in the adjudication of the class members' claims;

      b.      This is a challenge to a DEI initiative, and it is currently politically and culturally difficult to challenge DEI initiatives, such that many financial advisors would be intimidated to come forward (especially in a public proceeding) to assert their meritorious claims in their own names;

    c.    The cost of bringing this suit will likely require significant resources and skill, including expert witness analysis and testimony, that would render prosecuting an individual action against a large, sophisticated, and deep-pocketed party like Edward Jones practically infeasible;

    d.    Edward Jones is headquartered in this district, such that key documents and witnesses are in this district, and this Court has general jurisdiction over Edward Jones for fashioning nationwide relief; and

    e.    This case is imminently manageable because Plaintiff challenges an express, uniform Edward Jones policy under federal law that applies uniformly to all members of the Class.

52. This case also meets Rule 23(c)(4) and (c)(5)'s requirements because, as noted above, there are particular issues that are certifiable for resolution on a class or subclass basis.

53. Edward Jones, as the current or former employer of all class members, has robust contact and identifying information for all members of the Class, which means that adequate notice to the Class should be no challenge.

## CAUSE OF ACTION
## RACE DISCRIMINATION
### Violation of 42 U.S.C. § 1981

*(By Plaintiff on behalf of himself and the Class against each Defendant)*

54. Plaintiff repeats and realleges each and every allegation set forth above as if they were set forth here.

55. Edward Jones's race-based employment policies violate § 1981's guarantee that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and

enforce contracts," which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," and these rights "are protected against impairment by nongovernmental discrimination and impairment under color of State law."

56. Plaintiff and all members of the Class were employees of Edward Jones.

57. Edward Jones has express, race-based employment policies and practices.

58. Edward Jones's express race-based employment policies and practices constitute unlawful, intentional race-based discrimination.

59. Edward Jones's intentional, race-based discrimination policies and practices caused Plaintiff, and all members of the Class, to suffer adverse employment injuries with respect to their compensation, performance ratings, and opportunities for advancement, in an amount to be established at trial. Plaintiff and the members of the class also suffered emotional distress and other non-economic injuries (i.e. general damages) attendant to this intentional, discriminatory conduct.

60. Edward Jones acted maliciously or was recklessly indifferent to Plaintiff and the members of the Class, and their rights, such that punitive damages should be awarded in an amount to be established at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and other members of the Class, respectfully requests that the Court:

    a. Certify this action as a class action pursuant to Fed. R. Civ. Proc. 23;

    b. Designate Plaintiff and his counsel as representatives of the Class;

    c. Declare Edward Jones's policies and practices as unlawful;

d. Permanently enjoin Edward Jones from continuing their race-based employment policies and practices;

e. Award nominal, compensatory, general, and punitive damages to Plaintiff and the Class;

f. Award Plaintiff and the Class pre- and post-judgment interest, attorney's fees, and costs; and

g. Award Plaintiff and the Class such other relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully submitted,

Dated: March 10, 2025

CALABRO | LAW OFFICE

_/s/ J. Toji Calabro_
J. Toji Calabro #66574(MO)
Attorney for Plaintiffs
Two Pershing Square
2300 Main Street, 9th Floor
Kansas City, Missouri 64108
Phone: (888) 585-1247
Email: tojicalabro@calabro-law.com