UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRYAN D. WINTER, on behalf of          )
himself and all others similarly situated,  )
                                       )
            Plaintiff,                 )
                                       )        Case No. 4:25-cv-00299-SRC
      v.                               )
                                       )
EDWARD D. JONES & CO., L.P. et al.,    )
                                       )
            Defendants.                )

**<u>Memorandum and Order</u>**

Bryan Winter alleges that Edward Jones's equity policy—which pervades aspects of its promotion, advancement, and termination decisions—unlawfully discriminates against straight white male employees.  Winter seeks to certify a class action on behalf of similar Edward Jones employees.  Edward Jones responds that the Court cannot certify a class due to conflicts among proposed class members; thus, the argument goes, Winter must arbitrate his claims under securities-industry rules.  The Court addresses Edward Jones's motion to strike the class allegations and compel arbitration.

I.     **Background**

       A.     **Procedural background**

After Winter filed his initial complaint, doc. 1, Edward Jones filed a motion to strike Winter's class allegations and compel arbitration, doc. 21.  Before the Court could rule on this motion, however, Winter filed an unopposed motion to amend his complaint, doc. 24, which the Court granted, doc. 26.  The Court then denied Edward Jones's motion to strike as moot.  Doc. 26.  Winter filed his amended complaint, doc. 27, and Edward Jones filed a second motion to strike class allegations and compel arbitration, doc. 30.  The parties fully briefed this motion,

docs. 31, 34, 35, but again, before the Court could decide the motion, Winter sought leave to amend his complaint, doc. 39, which the Court again granted, doc. 41.  So the Court again denied Edward Jones's motion to strike as moot.  Doc. 41.

**B.     Factual background**

Winter filed his Second Amended Complaint on July 18, 2025.  Doc. 42.  In this complaint, he alleges the following facts, which the Court accepts as true for the purposes of Edward Jones's motion to strike, doc. 45.  *See Kelly v. Kosuga*, 358 U.S. 516, 517 (1959); *Barnidge v. United States*, 101 F.2d 295, 297 (8th Cir. 1939); *see also* 5C *Wright & Miller's Federal Practice & Procedure* § 1380 (3d ed. 2025) ("*Wright & Miller*") ("All well-pleaded facts are taken as admitted on a motion to strike but conclusions of law or conclusions drawn from the facts do not have to be treated in that fashion.").

**1.     Edward D. Jones & Co.**

Edward Jones provides financial services across more than 15,000 offices in the United States.  Doc. 42 at ¶¶ 9–10.  It employs over 19,000 financial advisors.  *Id.* at ¶ 11.  In its promotional materials, Edward Jones states that its employment policy focuses on equity.  *Id.* at ¶ 14.  And, according to Winter, this policy "permeates all aspects of an Edward Jones financial advisor's employment."  *Id.*  Winter states that Edward Jones's equity policy manifests itself in several different ways.

First, the policy undergirds the firm's Goodknight Incentive Compensation Structure.  *Id.* at 4 (The Court cites to page numbers as assigned by CM/ECF.).  According to Winter, a Goodknight transfers wages, increases an employee's job performance ratings, and provides job growth opportunity.  *Id.* at ¶ 16.  Under the Goodknight structure, Edward Jones transfers client assets from the book of one of its financial advisors to the book of another.  *Id.* at ¶ 17.  The

transferee advisor then receives fees and commissions on those transferred assets.  *Id.*  And Edward Jones "compensates the transferor financial advisor, as an incentive to agree to the transfer." *Id.*  But a transferor advisor receives additional compensation if he transfers assets to certain kinds of advisors.  *See id.* at ¶ 15.  For instance, a transferor advisor's compensation increases if he transfers assets to a new financial advisor, or to a financial advisor who "contributes to firm strategies"—that is, a financial advisor who is "diverse."  *Id.*  Diverse advisors include women, those who "identify as part of a minority race or ethnicity," and those who "identify as gay, lesbian, bisexual, trans[gender]," or other minority gender or sexual orientation.  *Id.*

Winter states that Goodknight transfers affect each financial advisor's performance ratings because "Edward Jones grades each of its financial advisors . . . based on the assets he/she brings into the firm and the commissions generated by his/her book of business."  *Id.* at ¶ 18.  Fees and commissions from a Goodknight asset transfer "count toward, and therefore increase, a financial advisor's numerical performance rating."  *Id.*

Second, Winter asserts that Edward Jones's promotion practices depend on its notions of equity as well.  *Id.* at ¶ 21.  Whenever financial advisors retire or otherwise leave the firm, they leave their offices and clients behind.  *Id.* at ¶ 23.  To fill these offices, Edward Jones "favors non-white candidates over whites," making "the race of the applicant—not merit—[a] but-for and motivating factor" in the firm's decision.  *Id.*

Third, Winter argues, Edward Jones imposes discriminatory termination standards on its white financial advisors.  *Id.* at ¶ 24.  Typically, when a white financial advisor's performance rating falls below a certain threshold (i.e., "a score of 30 out of 150," *id.*), Edward Jones gives that advisor a few months to raise his score.  *Id.*  If he does not, Edward Jones will usually

terminate his employment. *Id.* But, according to Winter, "when non-white financial advisors repeatedly fail to bring their performance scores up within the same time period, they are rarely terminated." *Id.*

Finally, Winter posits that Edward Jones's equity policy manifests itself in the firm's use of "Accountability Scorecards." *Id.* at ¶ 25. These scorecards "hold leadership accountable" by "grad[ing] middle managers on how many 'diverse' financial advisors they retain and promote." *Id.* Edward Jones then shares the scorecards with its leadership team and general partners, who use the scorecards as a "major factor when grading regional leadership." *Id.* A high score on an Accountability Scorecard "can result in extremely large bonuses" for a regional manager. *Id.*

### 2. Bryan Winter

Winter is a former employee of Edward Jones who identifies as a "straight white male," or SWM. *Id.* at ¶¶ 26, 33. For "nearly his entire career at Edward Jones," Winter states that his performance rating was 150, the maximum possible score. *Id.* at ¶ 30. Because of this, Winter "regularly qualified for bonuses and trips," *id.* at ¶ 31, and "was recognized numerous times" as a top performer by firm leadership, *id.* at ¶ 32. The firm also selected him to coach new and junior financial advisors "on how to better serve their clients, increase efficiency, and bring in more assets." *Id.* at ¶ 32.

Despite being a high-performing employee, however, Winter states that he eventually left Edward Jones because the firm's equity policy discriminated against him and other SWMs, creating "a toxic work environment." *Id.* at ¶ 33. He argues, first, that the Goodknight structure disadvantaged him because he was eligible for Goodknights while he worked there and "would have received more Goodknights" (or at least had a better chance of receiving them) were it not for Edward Jones's equity policy. *Id.* at ¶ 34. Second, Winter argues that SWMs "just did not

4

have a fair opportunity for advancement at Edward Jones" because of the policy. *Id.* at ¶ 35. And third, Winter states that Edward Jones's equity policy caused him to "los[e] all hope that he even had a fair chance to advance to the upper echelons of Edward Jones and make general partner." *Id.* at ¶ 40. So, Winter felt that he had "no choice but to leave his position at Edward Jones." *Id.* at ¶ 41.

Winter provides two examples of Edward Jones's equity policy in action. Once, he became aware of a discussion between regional leadership regarding a vacant office. *Id.* at ¶ 36. One leader suggested a black, female advisor for the position "because he needed a 'black skirt' to meet diversity goals," and the other leader reluctantly agreed. *Id.* And in another, leadership asked Winter to help "another black female financial advisor" who had been with Edward Jones for five years and had a performance rating "below the 30% performance threshold." *Id.* at ¶ 37. Despite the female advisor's subpar performance and her refusal to attend Winter's coaching sessions, leadership later selected her to fill a vacant office. *Id.*

### 3. Class action

Based on the foregoing facts, Winter seeks to certify a class of "[a]ll white men who do not identify as LGBTQ+, and who worked for Edward Jones as a financial advisor at any time since March 10, 2021" (the "SWM Class"). *Id.* at ¶ 44. This class would include two subclasses. The first, known as the "Goodknight Subclass," includes "[a]ll members of the SWM Class who were eligible for a Goodknight at any time since March 10, 2021." *Id.* at ¶ 45. And the second, known as the "Advancement Subclass," includes "[a]ll members of the SWM Class who were eligible for promotion or advancement at any time since March 10, 2021." *Id.*

Winter asserts that the proposed class and subclasses satisfy all certification requirements under Federal Rule of Civil Procedure 23(a). *See id.* at ¶¶ 46–52. He also argues that his

proposed classes fit under any type of class action under "Rule 23(b)(1), Rule 23(b)(2), Rule 23(b)(3), Rule 23(c)(4), and/or Rule 23(c)(5)." *Id.* at ¶ 43; *see also id.* at ¶¶ 54–57.

### 4.    Cause of action and prayer for relief

Winter sues Edward Jones for race discrimination under 42 U.S.C. § 1981, *see id.* at ¶¶ 59–65, on behalf of himself and "all other similarly situated current and former Edward Jones advisors," *id.* at ¶ 1.  He seeks (1) a declaration that Edward Jones's equity policy is unlawful; (2) a permanent injunction preventing Edward Jones from continuing its race-based employment policy; (3) nominal, compensatory, general, and punitive damages for himself and all class members; (4) pre- and post-judgment interest, attorney's fees, and costs for himself and all class members; and (5) such other relief as the Court deems proper.  *Id.* at 16–17.

### C.    Motion to strike class allegations and compel arbitration

Edward Jones then filed a motion to strike Winter's class allegations and compel arbitration.  Doc. 45.  Essentially, Edward Jones argues that Winter cannot certify a class because the proposed class and subclasses "are riddled with irreconcilable conflicts, unascertainable, and patently unmanageable." *Id.* at ¶ 13.  Edward Jones also argues that it and Winter "have a legally enforceable contractual obligation" to arbitrate disputes.  *Id.* at ¶ 11.  But Winter seeks to evade arbitration "by pleading his individual claim as a class action, which cannot be arbitrated under FINRA rules." *Id.*

Edward Jones therefore requests that the Court strike Winter's class action allegations and compel him to arbitrate his dispute with Edward Jones per his employment contract.  *Id.* at ¶ 15.  The parties have fully briefed this motion, docs. 46, 47, 48, and it's ripe for the Court's review.

6

II.    **Standard**

A.    **42 U.S.C. § 1981**

Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States" the same right "to make and enforce contracts" and "to the full and equal benefit of all laws," regardless of race.  42 U.S.C. § 1981(a).  The term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts," as well as "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Section 1981 therefore "prohibits racial discrimination in all phases and incidents of a contractual relationship," which includes employment contracts.  *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 962 (8th Cir. 2023) (citation omitted).

To prevail on a section 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).  This requires the plaintiff to show "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant."  *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009) (en banc).

Courts analyze section 1981 discrimination claims "under the same framework as Title VII claims."  *Collins v. Union Pac. R.R. Co.*, 108 F.4th 1049, 1052 (8th Cir. 2024).  This means that race need only be *one* but-for cause of an employer's adverse decision to trigger section 1981.  *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) (noting, in the Title VII context, that but-for causation "means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision" (emphasis in original)).  It also means that an employee need only suffer "a disadvantageous change to the compensation, terms,

7

conditions, or privileges of employment." *Collins*, 108 F.4th at 1053 (citation omitted); *see also Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024) (noting that a party complaining of discrimination under Title VII need not show that the harm incurred was significant).

### B.    Class actions

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted).  As such, a plaintiff seeking to certify a class "must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23.  *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 775 (8th Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).  And Rule 23 requires the plaintiff to satisfy two prongs.  *See* Fed. R. Civ. P. 23. First, the plaintiff must meet the "four threshold requirements" of Rule 23(a), *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Second, the plaintiff must "establish that the class fits within one of three types of class actions listed in Rule 23(b)."  *Avritt*, 615 F.3d at 1029.  Under the first type, a court may maintain a class action if separate actions might adversely affect individual class members or the opposing party.  *See* Fed. R. Civ. P. 23(b)(1).  Under the second, a court may maintain a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  And under the third, a court may

maintain a class action if "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods" of adjudication.  Fed. R. Civ. P. 23(b)(3).

A plaintiff may also seek variations on the typical class-action structure.  For example, "[w]hen appropriate," a plaintiff may bring a class action "with respect to particular issues." Fed. R. Civ. P. 23(c)(4).  To show that issue-class certification is appropriate, the plaintiff must establish that it would "materially advance the litigation."  *See Ford v. TD Ameritrade Holding Corp.*, 115 F.4th 854, 861 (8th Cir. 2024) (finding issue class certification inappropriate because, even if the court resolved the certified issue, "too many individualized issues would remain"); *see also In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008) (noting that courts that have approved issue certification still "have declined to certify such classes where the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation").  And, the plaintiff must also satisfy the Rule 23(a) and 23(b) factors, albeit only "with regard to the issue proposed for certification."  2 *Newberg & Rubenstein on Class Actions* § 4:92 (6th ed. 2025) ("*Newberg*").  Most often, the issue-class approach "contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on questions such as proximate causation and damages." *Manual for Complex Litigation* § 21.24 (4th ed. 2025); *see also* 2 *Newberg* §§ 4:90, 4:92 ; 7AA *Wright & Miller* § 1790.

Separately, a plaintiff may divide his main class "into subclasses that are each treated as a class." Fed. R. Civ. P. 23(c)(5).  Importantly, however, the plaintiff still must satisfy the Rule 23(a) and (b) requirements for each subclass.  *See Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559–63 (8th Cir. 1982).

Finally, a plaintiff may seek to certify a hybrid class.  A hybrid class action refers to "a single case in which plaintiffs seek both injunctive relief and monetary damages through certification under more than one section of Rule 23."  2 *Newberg* § 4:38.  This can take multiple forms, *see id.*, but the form most relevant here is the bifurcated approach.  Under this approach, a court may separate class action litigation into a liability phase (under Rule 23(b)(1) or Rule 23(b)(2)) and a damages phase (under Rule 23(b)(3)).  *Id.*; *see also* 7AA *Wright & Miller* § 1784.1; *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016) (recognizing the hybrid-certification method as "an available approach that is gaining ground in class action suits").

## C.    Motion to strike

Under Rule 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Though district courts enjoy "liberal discretion" to strike pleadings under that rule, *Stanbury L. Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000) (citation omitted), motions to strike nevertheless "are viewed with disfavor and are infrequently granted," *id.* (citation omitted); *see also* 5C *Wright & Miller* § 1382 (noting that motions to strike should generally be denied "unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action").  Still, striking portions of a complaint may sometimes be appropriate when the complaint "lacks a legal basis."  *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1092 (8th Cir. 2021).  And at the pleading stage of a class action, the court may strike class allegations if the pleadings make "'apparent . . . that the class cannot be certified.'"  *Id.* (quoting 5C *Wright & Miller* § 1383).

10

### D.    Motion to compel arbitration

The Federal Arbitration Act (FAA) governs arbitration agreements.  *See Hoffman v. Cargill Inc.*, 236 F.3d 458, 461 (8th Cir. 2001).  The FAA mandates broad enforcement of arbitration provisions:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.  The FAA establishes a "liberal federal policy favoring arbitration."  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted).  Accordingly, "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms."  *Id.* (citation modified).  But "[a] matter should not be sent to arbitration unless there is a valid agreement to arbitrate and the underlying dispute falls within the scope of that agreement."  *Northport Health Servs. of Ark., LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019) (citation omitted).

Before compelling arbitration, then, a district court must determine "(1) whether there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement."  *Robinson v. EOR-ARK, LLC*, 841 F.3d 781, 783–84 (8th Cir. 2016) (citation omitted).  The Court, rather than the arbitrator, decides these substantive questions of arbitrability unless the parties clearly and unmistakably delegated that issue to the arbitrator.  *See*

11

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995). Because "arbitration is a matter of contract," state-law contract principles govern the validity of an arbitration agreement. *Torres v. Simpatico, Inc.*, 781 F.3d 963, 968 (8th Cir. 2015) (citation omitted). "If a valid and enforceable arbitration agreement exists under state-law contract principles, any dispute that falls within the scope of that agreement must be submitted to arbitration." *Id.*

The Eighth Circuit has instructed that courts should analyze motions to compel arbitration "under a standard akin to [a motion for] summary judgment." *Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 741 (8th Cir. 2014). Accordingly, the Court must view the evidence in the light most favorable to the non-moving party, resolving all factual disputes in their favor. *See id.* at 742. The Court may not compel arbitration where any genuine issue of material fact remains as to whether a valid arbitration agreement exists. *See id.* at 744.

Arbitration agreements that involve members of FINRA or the securities industry are also subject to FINRA rules. FINRA is "a self-regulatory organization created under the Securities and Exchange Act" that "regulates the financial industry with approval by the Securities and Exchange Commission." *Luis v. RBC Cap. Mkts., LLC*, 984 F.3d 575, 577 (8th Cir. 2020). FINRA issues guidance on financial industry practice and "has the authority to pass rules with the force of law." *Id.* (citation modified).

Under FINRA's Code of Arbitration Procedure for Industry Disputes, a court may not enforce an otherwise enforceable arbitration agreement between two parties if one party sues in the form of a class action. *See* FINRA Rule 13204(a)(1)–(2). If, however, the court hearing the class-action dispute denies class certification, then the court may enforce the parties' original arbitration agreement if it is otherwise valid. *See id.* at 13204(a)(4).

12

### III.    Discussion

The Court first addresses Edward Jones's motion to strike class allegations and compel arbitration.  Doc. 45.  The Court finds that Winter may only pursue claims based on race discrimination (rather than sex- or sexual-orientation discrimination), that Winter is not an adequate class representative to seek equitable relief, and that Winter may not certify his proposed classes under Rule 23(b)(1) or (b)(2).  Thus, the Court grants Edward Jones's motion to strike in part.  Doc. 45.  But, because Winter's class allegations otherwise have a legal basis, the Court denies Edward Jones's motion to strike in all other respects.  *Id.*  So, the Court also denies, without prejudice, Edward Jones's motion to compel arbitration.  *Id.*

#### A.    Motion to strike class allegations

In deciding Edward Jones's motion to strike class allegations, doc. 45, the Court must determine whether Winter's Second Amended Complaint makes plain that his proposed class and subclasses cannot be certified.  *See Donelson*, 999 F.3d at 1092.  The Court begins by assessing Winter's complaint in light of Rule 23(a).

##### 1.    Numerosity

Winter alleges that his proposed classes meet the numerosity requirement under Rule 23(a)(1).  While the numerosity requirement has multiple relevant factors, *see Paxton*, 688 F.2d at 559–60, Winter states that "thousands of individuals are members of each class and subclass." Doc. 42 at ¶ 46.  And Edward Jones does not dispute this.  *See generally* doc. 46.  Therefore, the Court turns to commonality.

##### 2.    Commonality

To establish commonality under Rule 23(a)(2), a party must demonstrate that all class members "have suffered the same injury."  *Dukes*, 564 U.S. at 349–50 (citation omitted).  But

13

"merely advancing a question stated broadly enough to cover all class members is not sufficient." *Ebert*, 823 F.3d at 478. Rather, the class members' claims must "depend upon a common contention" that is "capable of classwide resolution." *Dukes*, 564 U.S. at 350. What matters, then, is the ability of the class action "to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted). Dissimilarities between proposed class members therefore "have the potential to impede the generation of common answers." *Id.* (citation omitted).

In his Second Amended Complaint, Winter argues that his proposed class and subclasses meet the commonality requirement because each class's dispute with Edward Jones depends on common questions of law or fact. *See* doc. 42 at ¶¶ 47–49. These questions, in essence, ask whether Edward Jones has an equity policy that unlawfully discriminates against SWM financial advisors. *See id*.

Edward Jones, however, argues that Winter cannot establish commonality for two reasons. First, the class and subclasses encompass SWMs who benefitted from the challenged policy—both members who "qualified as New [Financial Advisors] and received Goodknight transfers," as well as members who "receiv[ed] compensation incentives for transferring client relationships to New or diverse or female FAs." Doc. 46 at 16. And second, "determining liability would depend on the motives of thousands of decision-makers regarding tens of thousands of transfers, office assignments, promotions, and terminations." *Id.* at 16–17. That the proposed class also focuses on sex and sexual orientation, Edward Jones argues, makes this inquiry even more individualized and unmanageable. *Id.* at 17.

The Court notes that Winter brings his claims only under section 1981. *See* doc. 42 at ¶¶ 59–65. Section 1981 is limited to claims of race discrimination. *See Jones v. McNeese*, 746

14

F.3d 887, 896 (8th Cir. 2014).  It does not encompass claims for sex discrimination.  *See Butler v. Crittenden Cnty.*, 708 F.3d 1044, 1051 (8th Cir. 2013); *see also Pointer v. Bldg. Stars Advantage*, 115 F. App'x 321, 321 (8th Cir. 2004) (noting that section 1981 "does not apply to sex discrimination"); *DeGraffenreid v. Gen. Motors Assembly Div.*, 558 F.2d 480, 486 n.2 (8th Cir. 1977) (noting that the district court "correctly observed that sex discrimination in employment is not cognizable under § 1981").  Indeed, such claims, as well as discrimination claims based on sexual orientation, properly belong in a suit under Title VII of the Civil Rights Act of 1964.  *See* 42 U.S.C. § 2000e-2(a)(1) (forbidding an employer from taking an adverse employment action against an individual "because of such individual's race, color, religion, sex, or national origin"); *Bostock*, 590 U.S. at 662, 683 (holding that an employer's discrimination on the basis of sexual orientation or transgender status constitutes sex discrimination under Title VII).

Thus, because Winter brings this suit under section 1981, rather than under Title VII, the Court considers only whether Winter has alleged a common question regarding race discrimination.  Under section 1981, race need only be one but-for cause of the adverse employment decisions facing the class members, not the sole cause.  *See Bostock*, 590 U.S. at 656 (noting that an otherwise-successful employment discrimination action survives even if an employer supplies other but-for causes unrelated to a protected characteristic).  And the adverse employment decision need not be substantial or significant; the plaintiff need only show a "disadvantageous change" to the compensation, terms, or conditions of employment.  *Muldrow*, 601 U.S. at 354–55.

Here, Winter alleges that, but for the race of each class member, Edward Jones's equity policy would have incentivized firm leadership and veteran financial advisors to promote class

15

members or give them more Goodknight transfers.  *See* doc. 42 at ¶¶ 15–25.  He then argues that this policy caused the class members "to suffer adverse employment injuries with respect to their compensation, performance ratings, and opportunities for advancement."  *Id.* at ¶ 64.  Winter therefore adequately alleges the common question of whether Edward Jones treated the class members differently because of their race in violation of section 1981.  The answer to this question will drive the resolution of the litigation, because if Edward Jones made race-based distinctions among its employees, then the class and subclass members will be entitled to relief.

That some class members may have received Goodknights as new financial advisors is immaterial.  Winter does not argue that he and the other class members received no Goodknights whatsoever during their time at Edward Jones.  Rather, he argues that Edward Jones discriminated against class members by denying them Goodknights and related advancement opportunities because of their race.  Doc. 42 at ¶¶ 15–25, 59–65.  Indeed, even class members who received Goodknight transfers as new employees could still suffer harm from being denied other Goodknight transfers that went to diverse financial advisors.  In other words, Winter's complaint focuses not on what the class members received, but rather on what they did not receive—eligibility for the same Goodknights and advancement opportunities as diverse financial advisors.

As for the arguments that some class members transferred Goodknights to diverse employees as veteran financial advisors, and that the Goodknight transfers and promotions are based on individualized determinations, the Court declines to decide those issues "on the basis of the pleadings alone."  *Int'l Woodworkers of Am., AFL-CIO, CLC v. Ga.-Pac. Corp.*, 568 F.2d 64, 67 (8th Cir. 1977) (citation omitted).  Discovery will reveal whether a disparity existed in Goodknight transfers and promotions to class members after Edward Jones enacted its equity

16

policy.  *See id.* (noting that where the pleadings "do not conclusively show" whether Rule 23 requirements are met, "the parties must be afforded the opportunity to discover and present documentary evidence on the issue" (citation omitted)).  Discovery will also establish or disprove Edward Jones's claims of conflict.  The Court declines to strike Winter's race-based class allegations on commonality grounds.  But, as noted above, the Court finds that Winter cannot bring discrimination claims based on sex or sexual orientation under section 1981.  The Court therefore strikes Winter's class allegations insofar as they discuss discrimination based on sex or sexual orientation.

The Court's striking of these allegations necessitates a modified class definition.  That modified definition excludes discussion of class members' sex and sexual orientation and includes discussion of class members' race, effectively leaving the class definition as "white financial advisors who worked for Edward Jones at any time since March 10, 2021."  The Court grants Winter leave to file, no later than January 2, 2026, an amended complaint that conforms to the Court's rulings.

### 3.    Typicality

Under Rule 23(a)(3), typicality involves whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A party satisfies typicality if his claims and the claims of the other class members "stem from a single event or are based on the same legal or remedial theory."  *Paxton*, 688 F.2d at 561–62 (citation omitted).  Typicality "is fairly easily met so long as other class members have claims similar to the named plaintiff."  *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018); *see also Custom Hair Designs by Sandy v. Cent. Payment Co.*, 984 F.3d 595, 604 (8th Cir. 2020).

Here, Winter alleges that he satisfies typicality because he "worked . . . at Edward Jones during the relevant time period," and "was subject to the same discriminatory policies" as other class and subclass members. Doc. 42 at ¶ 50. He also alleges that he was eligible for Goodknights and advancements during the relevant period. *Id.* at ¶¶ 51–52. Edward Jones, in contrast, argues that Winter does not satisfy typicality because Winter both "alleges facts to demonstrate his belief that he is exceptional" (i.e., not typical), and did not allege that Edward Jones denied him any specific office assignment or promotion. Doc. 46 at 19. Winter's injury, it argues, therefore "has no bearing on whether others with different histories, performance levels, and/or qualifications were injured." *Id.*

The Court disagrees with Edward Jones. As explained above, Winter alleges individual and class claims based on the same legal theory: whether Edward Jones discriminated against class members on the basis of race in violation of section 1981. That Winter did not allege Edward Jones denied him a particular Goodknight or advancement determines nothing. Winter challenges a general policy at Edward Jones that allegedly made him less likely to receive Goodknight transfers and advancement opportunities. Thus, he argues that the policy harmed him because it affected his compensation and terms of employment. Winter alleges this same harm on behalf of his fellow class members. And this alleged harm suffices for a prima facie case under section 1981. *See Muldrow*, 601 U.S. at 355; *see also Collins*, 108 F.4th at 1053.

Additionally, as noted above, Winter seeks to certify two subclasses in this case. These subclasses encompass members who were eligible for their respective benefits (i.e., Goodknights for the Goodknight Subclass and advancements for the Advancement Subclass). *See* doc. 42 at ¶ 45. So, any differences between Winter and his fellow subclass members regarding performance levels or qualifications do not defeat typicality. *See Paxton*, 688 F.2d at 562

("Typicality is not defeated because of . . . the differing qualifications of the plaintiffs and class members."); *see also Custom Hair Designs*, 984 F.3d at 604 ("Since plaintiff's claims resemble the theories applicable to all class members, minor factual variations . . . do not defeat typicality."). Winter therefore adequately alleges typicality.

### 4.    Adequacy

Under Rule 23(a)(4), the adequacy prong examines (1) whether "the class representatives have common interests with the members of the class," and (2) "whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562–63.

Here, Winter alleges, and Edward Jones does not dispute, that class counsel is adequate because they have "extensive experience in complex litigation, including employment and class action experience." Doc. 42 at ¶ 53. But Edward Jones separately argues that Winter is not an adequate class representative, because "his interests conflict with those of his proposed class, which itself is riddled with internal conflict." Doc. 46 at 14. This conflict, Edward Jones posits, results from Winter's class definition, which would encompass white financial advisors who benefited from the Goodknight program, either by receiving transfers as new employees or by making transfers to diverse employees as veteran financial advisors. *Id.* at 15. This class would also contain white financial advisors who "could not have been harmed by the Goodknight program because they . . . were not eligible to receive [Goodknight transfers]." *Id.*

The Court finds Edward Jones's arguments unpersuasive. Winter's complaint challenges only the Goodknight transfers to diverse employees, not transfers to new financial advisors generally. *See* doc. 42 at ¶¶ 15–20. And, as explained above, Winter's claim focuses not on what white financial advisors may have received under the Goodknight structure, but rather on

what they *did not receive*—eligibility for the same Goodknight transfers as diverse employees. And finally, the Court does not have enough evidence at this stage to determine the veracity of Edward Jones's claims of conflict. Only discovery by the parties can establish or disprove these claims. *See Int'l Woodworkers*, 568 F.2d at 67. So, the Court will not strike Winter's class allegations on this ground.

Still, the relief Winter seeks raises difficult questions about adequacy. Winter, a former employee of Edward Jones, seeks to represent a class of "all other similarly situated current and former Edward Jones advisors." Doc. 42 at ¶ 1; *see also id.* at ¶ 58 (referring to Edward Jones as "the current or former employer of all class members"). And in his prayer for relief, Winter seeks both a declaratory judgment and an injunction against Edward Jones in addition to damages. *See id.* at 16–17.

But Winter must have standing for each form of relief that he seeks. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." (citation omitted)). Because Winter is a former employee, an injunction or a declaratory judgment will not redress his alleged injury, as he cannot establish that Edward Jones's policy will harm him again in the future. *See Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (finding that plaintiff who suffered chokehold by police officers lacked standing to seek equitable relief because he could not establish "a real and immediate threat" that he would be choked again in the future); 1 *Newberg* § 2:7 (noting that "a plaintiff who has suffered an actual injury but is unlikely to suffer further injury in the future" is "unable

20

to seek equitable relief even if other class members are likely to suffer future injury").  Thus, Winter does not have standing to seek equitable relief on his own behalf.

And because Winter lacks standing to seek injunctive or declaratory relief for himself, he may not seek these remedies on behalf of his proposed classes.  *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."); *Sabers v. Delano*, 100 F.3d 82, 84 (8th Cir. 1996) ("Absent standing to bring the claim in her own right, [the plaintiff] is not eligible to represent a class of persons raising the same claim.").  Winter's allegation that he is an adequate class representative to seek injunctive and declaratory relief therefore lacks a legal basis.  *See* 1 *Newberg* § 3:59 ("If a court finds that standing is lacking [then] adequacy will be as well, for a plaintiff cannot be an adequate representative for claims she does not have standing to pursue.").

But Winter does have standing to seek damages against Edward Jones, because damages would redress his alleged past harm.  *See Lyons*, 461 U.S. at 105–09 (finding that plaintiff who lacked standing to seek injunction against police officers for illegal chokehold likely still had standing to pursue damages against officers); *Hillesheim v. Holiday Stationstores, Inc.*, 903 F.3d 786, 792 (8th Cir. 2018) ("Traditional money damages are payable to compensate for the harm of past conduct . . . and remain live regardless of whether future harm is threatened." (citation modified)).  So, Winter may seek damages on behalf of his proposed classes.  *See Mayo v. UBS Real Est. Sec., Inc.*, No. 08-00568-CV-W-DGK, 2011 WL 1136438, at *4 (W.D. Mo. Mar. 25, 2011) (holding that class-action plaintiff who lacked standing to seek injunctive relief was still an adequate representative to seek damages on behalf of class); *see also* 1 *Newberg* § 2:7 (noting

that "a plaintiff who has suffered an actual injury but is unlikely to suffer further injury in the future may have standing to bring an individual or class claim for damages").

Winter's complaint makes apparent that Winter is not an adequate class representative for a class that seeks injunctive or declaratory relief. Therefore, the Court grants Edward Jones's motion to strike, doc. 45, insofar as Winter alleges that he may represent claimants seeking injunctive or declaratory relief.

### 5.    Ascertainability

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci.*, 821 F.3d 992, 996 (8th Cir. 2016) (citation omitted). The Eighth Circuit treats ascertainability as an implicit requirement that requires courts to adhere to "a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'" *Id.*; *see also McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). But, when there is "a dispute regarding the method for identifying class members," the Court should conduct "an independent discussion of whether a class is ascertainable." *McKeage*, 847 F.3d at 998. A class is ascertainable "when its members may be identified by reference to objective criteria." *Id.*

Here, Edward Jones argues that Winter's proposed class is not clearly ascertainable for two reasons. First, Edward Jones states that "[t]here is no way for the Court to determine on a class wide basis which of Edward Jones's more than 19,000 FAs do not identify as LGBTQ+." Doc. 46 at 20. But, because the Court finds that Winter may not pursue a claim based on sex- or sexual-orientation discrimination under section 1981, this argument is moot. The Court also notes that, while Edward Jones states that it has a voluntary self-disclosure form for employees'

LGBTQ+ status, *see* doc. 46-3, it does not state that it has similar voluntary identification forms for employees' race.  Therefore, discovery may reveal employment records Edward Jones possesses that provide objective criteria for determining the race of each class member.  And common sense, *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), suggests that by maintaining a policy that takes race into account, Edward Jones itself ascertains the race of its employees. Therefore, the Court declines to strike Winter's class allegations on this ground.

Second, Edward Jones argues that Winter "does not define what it means to be 'eligible' for a Goodknight, promotion, or 'advancement,' and further fails to define 'advancement." Doc. 46 at 20.  And even if Winter did define these terms, Edward Jones argues, the Court would still need to undertake "individualized analyses to determine whether each SWM employed was: (1) eligible for a Goodknight; (2) eligible for 'advancement,'(3) eligible for promotion; and (4) eligible for an office assignment." *Id.*

Winter counters that discovery "will surely reveal evidence of [Edward Jones's] objective eligibility for Goodknights and advancement opportunities, and the objective employee data [Edward Jones] maintains will almost certainly identify the specific employees who meet those criteria." Doc. 47 at 23.  Edward Jones responds that, even with discovery, Winter's class is still not ascertainable, because "discovery would require endless individualized inquiries." Doc. 48 at 12.  At this stage, the Court finds that Winter's class allegations do not conclusively show that his proposed class lacks ascertainability.  As with the race of each class member, discovery may reveal that Edward Jones possesses objective criteria to determine the eligibility of each class member for Goodknights, promotion, or advancement.

### 6. Rule 23(b)

In addition to satisfying all of Rule 23(a)'s prerequisites, Winter must also show that each of his proposed classes falls under at least one of the types of class actions in Rule 23(b). *See Avritt*, 615 F.3d at 1029.

### a. Rule 23(b)(1)

A court may certify a class action under Rule 23(b)(1)(A) when prosecuting separate actions would risk "inconsistent or varying adjudications . . . that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). This subsection encompasses cases "where the party is obliged by law to treat the members of the class alike . . . or where the party must treat all alike as a matter of practical necessity." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (citation omitted).

Separately, a court may certify a class under Rule 23(b)(1)(B) when prosecuting separate actions would be "dispositive of the interests" of absent class members or would "substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). The most common example of a Rule 23(b)(1)(B) class is a "limited fund" case, which occurs when "numerous persons make claims against a fund insufficient to satisfy all claims." *Amchem*, 521 U.S. at 614; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832–41 (1999). Notably, Rule 23(b)(1) classes are mandatory, meaning that class members may not opt out of the litigation, and the Court need not provide class members notice of the action. *See* Fed. R. Civ. P. 23(c)(2).

Winter asserts that his proposed classes satisfy Rule 23(b)(1)(A). He argues that separate actions would create a substantial risk of "inconsistent or varying adjudications as to the legality of the same nationwide Edward Jones policies." Doc. 42 at ¶ 54(a). Edward Jones counters that 23(b)(1)(A) certification is improper because Winter seeks individualized monetary damages and

because there is no risk that inconsistent judgments would prevent Edward Jones from pursuing a uniform course of conduct.  Doc. 46 at 21.

As previously discussed, Winter can seek only monetary damages—not injunctive or declaratory relief.  Because of this, any monetary relief Winter seeks would not be "incidental" to equitable relief.  *Dukes*, 564 U.S. at 360–63.  And this monetary relief would be individualized, because the extent of compensable harm (i.e., how many Goodknights or advancements a class member was denied) would vary for each class member.  Such individualized claims do not belong under Rule 23(b)(1), which "provides no opportunity for . . . class members to opt out" or receive notice.  *Id.* at 362.  Instead, "individualized monetary claims belong in Rule 23(b)(3)."  *Id.*  The Court therefore finds that Winter may not certify his proposed classes under Rule 23(b)(1)(A).

Winter also alleges that his proposed classes satisfy Rule 23(b)(1)(B), because the adjudication of his case "would be dispositive of the interests of the other members of the Class not parties to this proceeding, or would substantially impair or impede their ability to protect their interests."  Doc. 42 at ¶ 54(b).  But Winter does not allege facts showing how this would be the case.  For instance, he does not allege a limited-fund class action, *see Amchem*, 521 U.S. at 614—in fact, in his memorandum in opposition, he expressly disclaims that one exists here, *see* doc. 47 at 26 n.23.  Nor does he allege that this proposed class action constitutes a "paradigmatic" case under the Employee Retirement Income Security Act of 1974 (ERISA).  *See* 7 *Newberg* § 23:28.  Nor, still, does he allege any of the other "[c]lassic examples" of Rule 23(b)(1)(B) cases, such as a suit "brought to reorganize fraternal-benefit societies," an "action[] by shareholders to declare a dividend," or an action charging "a breach of trust by an indenture trustee or other fiduciary" affecting a large class of beneficiaries.  *Ortiz*, 527 U.S. at 833–34.

25

Instead, Winter merely argues that he satisfies Rule 23(b)(1)(B) because a decision that Edward Jones's policy is unlawful would "'as a practical matter' be 'dispositive' for others at [Edward Jones] who may want to maintain it." Doc. 47 at 26. But as the Court previously noted, Winter may seek only monetary relief in this case. The Court therefore finds that Winter does not adequately allege the existence of a class under Rule 23(b)(1)(B). Accordingly, the Court grants Edward Jones's motion to strike insofar as Winter seeks to certify a class under Rule 23(b)(1). But the Court grants Winter leave, should he so choose, to amend his Rule 23(b)(1) allegations consistent with the Court's rulings.

### b.      Rule 23(b)(2)

To certify a Rule 23(b)(2) class, the "class claims . . . must be cohesive." *Donelson*, 999 F.3d at 1093 (citation omitted). Put differently, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020) (quoting *Dukes*, 564 U.S. at 360). The cohesiveness requirement is "more stringent than the . . . requirements for maintaining a class action under Rule 23(b)(3)," because a 23(b)(2) class is mandatory and "provides no opportunity for (b)(2) class members to opt out" or receive notice. *Ebert*, 823 F.3d at 480. Thus, when class members have "a significant number of individualized factual and legal issues" among them, the class is not cohesive, and a court should not certify the class under Rule 23(b)(2). *Donelson*, 999 F.3d at 1093. Individualized factual and legal issues exist when "'members of a proposed class will need to present evidence that varies from member to member' such that the class claim is not 'susceptible to generalized, class-wide proof.'" *Id.* (quoting *Ebert*, 823 F.3d at 478–79).

For the reasons explained above, Winter cannot maintain a class action for injunctive or declaratory relief when he and many other class members are former employees. This is because

a single injunction or declaratory judgment would not provide relief to each member of the class. *See Harris*, 953 F.3d at 1033. The class claims are therefore not cohesive, and Winter may not certify his proposed classes under Rule 23(b)(2). The Court grants Edward Jones's motion to strike on this ground, but notes again that Winter may amend his complaint consistent with the Court's rulings.

### c.  Rule 23(b)(3)

Rule 23(b)(3) requires a plaintiff to establish both predominance and superiority. *See* Fed. R. Civ. P. 23(b)(3). The predominance requirement "is even more demanding than Rule 23(a)." *Behrend*, 569 U.S. at 34; *see also Cody v. City of St. Louis ex rel Medium Sec. Inst.*, 103 F.4th 523, 530 (8th Cir. 2024). This inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted); *see also Meek v. Kan. City Life Ins. Co.*, 126 F.4th 577, 583 (8th Cir. 2025). An individual question is one where "members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Bouaphakeo*, 577 U.S. at 453 (cleaned up). The superiority requirement, in contrast, requires a plaintiff to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Custom Hair Designs*, 984 F.3d at 605 (citation omitted). A class action is superior when "the class members' claims are generally small and unlikely to be pursued individually." *Id.* (citation omitted).

Here, Winter alleges that he meets Rule 23(b)(3)'s predominance requirement because his action challenges "an express, nationwide Edward Jones policy that applies uniformly, such

that any individual issues would be minimal." Doc. 42 at ¶ 56(a).  He also alleges that he meets superiority because of the politically charged nature of the suit and the significant amount of resources needed.  *Id.* at ¶ 56(b)–(c).  Edward Jones responds that Winter's proposed classes do not meet the predominance requirement because "individualized inquiries predominate" regarding the promotions and Goodknight transfers that it allegedly denied class members.  Doc. 46 at 24.  It further states that Winter fails to satisfy predominance because "a substantial portion . . . of the proposed class *benefits* from the very program about which [Winter] complains."  *Id.* (emphasis in original); *see also* doc. 48 at 16.

The Court finds that Winter adequately alleges predominance and superiority at this stage.  As explained above, Winter asserts a question common among all class members—i.e., whether Edward Jones's equity policy discriminates against class members in violation of section 1981.  And Winter also alleges that the same evidence (that is, the Goodknight incentive structure and the Accountability Scorecards) will suffice for each subclass member to make a prima facie showing of race discrimination under section 1981.  *See Bouaphakeo*, 577 U.S. at 453.

Edward Jones's counterarguments are unavailing.  First, as previously mentioned, race need only be one but-for cause of an adverse-employment decision—not the sole cause.  *Bostock*, 590 U.S. at 656.  So, Edward Jones cannot escape liability merely by pointing to non-race-based factors that provide alternative reasons for the alleged racial discrimination under section 1981.  And second, the argument that some class members may have benefited from the policy by sending or receiving Goodknights fails for the same reasons explained previously.

### 7.    Hybrid class actions

In his memorandum in opposition to Edward Jones's motion to strike, Winter states that he seeks a hybrid class certification, using Rule 23(b)(1) or 23(b)(2) for liability purposes and Rule 23(b)(3) for damages purposes. *See* doc. 47 at 24, 26. Winter's Second Amended Complaint, however, contains no such request. While Winter states in his complaint that he brings this putative class action "pursuant to . . . Rule 23(b)(1), Rule 23(b)(2), Rule 23(b)(3), Rule 23(c)(4), and/or Rule 23(c)(5)," doc. 42 at ¶ 43, he makes no mention of hybrid class actions or bifurcated proceedings. And further, while Winter states that "there are particular issues that are certifiable for resolution on a class or subclass basis" under Rule 23(c)(4) or 23(c)(5), *id.* at ¶ 57, he does not clarify in his complaint which issues he thinks appropriate for certification.

A party may not amend his complaint through a memorandum. *See Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1140 (8th Cir. 2014) (holding that plaintiff could not "unilaterally dismiss or withdraw" the federal claims from his complaint using a memorandum in opposition to a motion for summary judgment). The Court therefore makes no findings and takes no position on whether Winter could properly plead a hybrid class. The Court does, however, grant Winter leave to amend his complaint to allege the existence of a hybrid class.

### 8.    Summary of motion to strike class allegations

In sum, the Court finds that Winter's Second Amended Complaint establishes a legal basis for certifying his proposed classes. Winter properly alleges that he meets the requirements of Rule 23(a) to the extent he seeks to recover damages on behalf of the classes based on alleged race discrimination. He also properly alleges that his proposed classes meet at least one of the requirements under Rule 23(b). Winter may not, however, seek injunctive or declaratory relief.

Nor may he pursue claims based on sex- or sexual-orientation discrimination.  The Court therefore grants Edward Jones's motion to strike only insofar as Winter alleges (1) claims of discrimination on the basis of sex or sexual orientation; (2) adequacy of representation to seek injunctive or declaratory relief; and (3) class certification under Rule 23(b)(1) or 23(b)(2).  Doc. 45.  But, as stated above, the Court grants Winter leave to amend his complaint consistent with the Court's rulings.  The Court denies Edward Jones's motion to strike in all other respects.  *Id.*

      **B.**      **Motion to compel arbitration**

      The Court turns to Edward Jones's motion to compel arbitration.  Doc. 45.  Edward Jones argues that the Court should compel Winter to engage in arbitration because (1) the parties agreed to arbitrate any employment disputes, doc. 46 at 12, (2) this agreement is a valid contract, *id.* at 11, and (3) the Federal Arbitration Act makes this agreement enforceable, *id.* at 10.  The Court need not address these arguments.  As explained above, the Court finds that Winter's class allegations have a legal basis, so the Court does not strike the class allegations in full at this time.  And because the Court declines to completely strike the class allegations, Winter's suit proceeds as a putative class action, for which FINRA's rules do not allow arbitration.  *See* FINRA Rule 13204.  Thus, the Court finds it inappropriate to compel arbitration at this stage.  But the Court notes that, should the Court ultimately decline to certify Winter's proposed classes, Edward Jones may again move to compel arbitration.  *See id.*  The Court therefore denies, without prejudice, Edward Jones's motion to compel arbitration.  Doc. 45.

**IV.**      **Conclusion**

      Accordingly, the Court grants in part and denies in part Edward Jones's [45] Motion to Strike Class Allegations.  Specifically, the Court orders the class allegations struck insofar as Winter (1) brings claims of discrimination based on sex or sexual orientation; (2) seeks

injunctive or declaratory relief on behalf of himself and the members of the class; and (3) seeks class certification under Rule 23(b)(1) or 23(b)(2).  The Court grants Winter leave to file, no later than January 2, 2026, an amended complaint that conforms to the Court's rulings.  The Court denies Edward Jones's Motion to Strike Class Allegations on all other grounds.  Finally, the Court denies, without prejudice, Edward Jones's [45] Motion to Compel Arbitration.

So ordered this 18th day of December 2025.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE